## The People v. Daniel Hanrahan.

*Criminal law—Municipal corporations—By-laws and ordinances—*
*Statutes—Repeal—Constitutional law.*

1. Act No. 34, Laws of 1887, making the offense of keeping a house of ill fame a felony, and punishable as such, does not repeal by implication the provision of the charter of the city of Detroit authorizing the common council to prohibit, prevent, and suppress the keeping of such houses.

2. The following propositions are summarized from the opinion of Mr. Justice CHAMPLIN:

   *a*—The constitutional provisions relating to laws passed by the Legislature do not apply to ordinances enacted by the common council of a city.

   *b*—The Legislature has the constitutional power to confer upon the common council of a city authority to prohibit, prevent, and suppress the keeping and leasing of houses of ill fame, and to restrain, suppress, and punish the keepers thereof, and the owners and lessors of such premises.

   *c*—The Legislature has power to declare that certain acts committed in a particular locality shall constitute a criminal offense, and be punished as a felony, although such acts, if committed in another locality or section of the State, would not be a criminal act at all.

   *d*—To declare *what* shall constitute a crime, and how it shall be punished, is an exercise of the soverign power of a state, inherent in the legislative department of the government, and, unless authorized by the constitution, this power cannot be delegated to any other body or agency.

   *e*—The general criminal laws of the State are in force in every part thereof, and none but the enacting power can suspend or repeal them.

   *f*—The Constitution has granted to the Legislature authority to *delegate* to a city or village the right to enact by-laws and ordinances to prevent vice and immorality, and for the enforcement of good order within the limits of the corporation, and for numerous other purposes affecting the health and welfare of its people; and, acting under this authority, the Legislature has conferred power upon the municipalities to *enforce* the observance of these ordinances by fine or imprisonment, or both.

   *g*—The word " crime " is applicable to both a " felony " and

| 75 | 611 |
| 75 | 652 |

| 75 | 611 |
| 79 | 601 |

| 75 | 611 |
| 82 | 412 |
| 82 | 424 |
| 82 | 479 |

| 75 | 611 |
| 85 | 111 |

| 75 | 611 |
| 86 | 597 |

| 75 | 611 |
| 105 | 132 |

| 75 | 611 |
| 115 | 171 |

| 75 | 611 |
| 146 | 449 |

"misdemeanor," and the words "offense" and "crime" are synonymous, when applied to convictions for violations of statutes of a *public* nature, and said words are used interchangeably in our compilations.

*h*—Whenever a person does an act which is prohibited by law, and is punishable by fine, penalty, forfeiture, or imprisonment, he commits a crime.

*i*—An ordinance, validly enacted, prohibiting certain acts under fines, penalties, or imprisonment, is, within the jurisdiction of the municipality enacting it, as much entitled to respectable obedience, and is as much the law of the land for that locality, as a law enacted by the Legislature; and a person violating it commits an offense, and in one sense a crime, for which he may be sentenced, if under the authority of a statute the ordinance so provides, to imprisonment at hard labor.

*j*—It rests in the sound discretion of the Legislature to determine to what extent they will give to municipal courts authority to punish offenders; but whatever authority is delegated to these bodies to legislate upon the subject of offenses, and to prescribe within certain limits the punishment to be inflicted therefor, the constitutional rights of the accused must be protected and preserved in everything that is done, as fully as if the prosecution was for a crime under the *general* law of the State.

*k*—Hard labor, in itself, is not infamous or degrading, but ennobling, and is the foundation upon which reposes all true progress in mental and moral development.

"An angel's wing would droop if long at rest,
And God himself, inactive, were no longer blest."

The infamy and degradation consist in its being *involuntary*. The distinction is the difference between liberty and slavery.

*l*—Repeal by implication is never permitted if it can be avoided by any reasonable construction of the statute. If both acts can be given full force without conflicting with each other, or if the latter act is merely affirmative, or cumulative, or auxiliary, and not inconsistent, both must stand.

8. After an exhaustive discussion of the question of the *effect* of the passage of a statute general in its terms, provisions, and application upon a *local* statute providing for a particular case or class of cases, the following conclusions are reached:

*a*—The *local* act may be exclusive of the general law, and operate to repeal it by implication; as when its provisions are repugnant to or inconsistent with the general law, in which case there can be no prosecution except it be under it.

*b*—Both laws may be *concurrent*, as where there is no repugnance, or where one is merely auxiliary or cumulative to the other, in which case prosecutions may be instituted under *either*

law, and the court that *first* acquires jurisdiction over the person of the accused has *exclusive* jurisdiction to hear, try, and determine the case, and a conviction for an offense which is the same in both laws will be a bar to a prosecution for the same offense under the *other* law.

Certiorari to recorder's court of the city of Detroit. (William Look, one of the judges of the Wayne circuit court, presiding at the request of Recorder Swift.)   Argued January 27, 1888, and reargued on a rehearing May 15, 1888.   Decided July 11, 1889.

Respondent was convicted, on his plea of guilty, in the recorder's court of the city of Detroit, under an ordinance of said city, of keeping a house of ill fame, and sentenced to pay a fine of $500 *forthwith,* and, in default thereof, to be committed to the Detroit House of Correction until payment of said fine, not exceeding six months, which sentence was affirmed in the Supreme Court.   The facts are stated in the opinion.

*James H. Pound,* for respondent.

*George F. Robison,* prosecuting attorney, and *John W. McGrath,* city counselor, for the People.

CHAMPLIN, J.   For many years prior to 1887 there existed a statute relating to offenses against chastity, morality, and decency, which reads as follows:

" Every person who shall keep a house of ill fame, resorted to for the purpose of prostitution or lewdness, shall be punished by imprisonment in the county jail not more than one year, or by fine not exceeding three hundred dollars." How. Stat. § 9286.

At the session of the Legislature in 1887 this section was amended by Act No. 34, so as to read as follows:

" Every person who shall keep a house of ill fame, resorted to for the purpose of prostitution or lewdness, and every person who shall solicit, or in any manner induce, a female to enter such house for the purpose of becoming a prostitute,

or shall by force, fraud, deceit, or in any like manner procure a female to enter such house for the purpose of prostitution or of becoming a prostitute, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the State prison not more than five years, or in the county jail not more than one year, or by fine not exceeding one thousand dollars, or by both such fine and imprisonment, in the discretion of the court."

The charter granted by the Legislature to the city of Detroit in 1883, among other provisions, contained the following provision:

" The common council may prohibit, prevent, and suppress the keeping and leasing of houses of ill fame or assignation or for the resort of common prostitutes, disorderly houses, and disorderly groceries. It may restrain, suppress, and punish the keepers thereof, and the owners and lessors of such premises." Local Acts of 1883, chap. 7, § 47, p. 611.

Section 54 of the same chapter provides that—

" The common council shall have power to provide for the imprisonment and confinement in houses of correction, at hard labor or otherwise, of all persons liable to be imprisoned or confined under this act or any act relating to said city, or any ordinance of the common council. * * * Said council shall also have power, except as herein otherwise specified, to provide for the punishment of all persons offending against this act, or any law relating to said city, or any ordinance of the common council enacted under this or any other act of the Legislature, by imposing fines, penalties, forfeitures, and costs, and by imprisonment in the house of correction of said city. * * * If only a fine, penalty, forfeiture, or costs be imposed, the offender may be sentenced to imprisonment until the payment thereof, for a term not exceeding six months. * * * No penalty or forfeiture shall exceed one thousand dollars; no fine shall exceed five hundred dollars; and no imprisonment shall exceed the period of two years."

Under the authority claimed to have been conferred by the foregoing provisions of the charter the common council passed an ordinance entitled " Disorderly Houses," section 1 of which provides that—

"No person shall keep within the limits of the city of Detroit any house of ill fame, house of assignation, or house for the resort of common prostitutes, * * * or shall in any manner contribute to the support, carrying on, or keeping of any such house or place."

Section 4 provides that—

"Any person who shall violate any of the provisions of this ordinance shall be punished by a fine not to exceed five hundred dollars, and costs of prosecution; and the offender may be sentenced to be imprisoned in the house of correction until the payment thereof: *Provided, however*, that the term of such imprisonment shall not exceed six months."

Daniel Hanrahan, the respondent, pleaded guilty in the recorder's court of the city of Detroit to a complaint made against him under said ordinance of keeping and maintaining a certain house of ill fame, resorted to for the purpose of prostitution and lewdness, and was sentenced—

"To pay a fine of five hundred dollars forthwith, and, in default thereof, be committed to the Detroit House of Correction, and therein safely kept and employed, according to the laws thereof, until said fine, and the costs of commitment, one dollar, be paid: *Provided, however*, that said term of imprisonment shall not exeeed the period of six months."

The fine was not paid, and he was committed, whereupon he sued out a writ of *certiorari*, and has brought the record here for review.

He assigns as error—

1. The want of power and authority of the recorder's court to impose the sentence.

2. That the ordinance under which the proceedings were had is not, in effect, within the title of such ordinance.

3. That the general statutes of the State covered the offense charged, and provided for its punishment.

4. That the amendment of 1887 entirely superseded the ordinance.

All of which went to the jurisdiction of the court to impose the sentence.

There is no merit in the objection relating to the title of

the ordinance, and it needs no discussion. The constitutional provisions relating to laws passed by the Legislature do not apply to ordinances enacted by a common council of a city.

Under our Constitution the power to enact laws is vested in the Legislature. But the Legislature is authorized by Article 4, § 38, to confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such powers of a local, legislative, and administrative character as they may deem proper. The object was to secure to local municipalities the power of self-government in matters of purely local concern.

The nature and extent to which the Legislature may confer this legislative power upon municipalities within their territorial limits is entirely within the discretion of the Legislature. In exercising the power conferred of passing such laws of a local character as the wants of a particular community call for, it must happen that very many of the lesser crimes and misdemeanors which are punished under general laws must come under the police regulations of such municipalities, because they are more liable to be perpetrated by the vicious class who congregate in cities than elsewhere; and the peace and good order of the municipality require that they should be more promptly and summarily dealt with than they could be under the State law.

I have no doubt that it was competent under the Constitution for the Legislature to confer upon the common council of the city of Detroit the authority contained in the sections of the charter above quoted. The ordinance appears to have been authorized by the charter.

That the suppression of houses of ill fame in a city is a matter of great local concern there can be no question. That it can be dealt with more effectively by the city authorities than by the State, I think is plain. It would be contrary to the fact to assert that houses of ill fame in the midst of a

city are not dangerous and revolting nuisances. They contaminate the morals of society, and render respectable neighborhoods obnoxious to decent people by their presence. Their suppression demands the closest attention of the guardians of the peace, and the most stringent police regulations to accomplish the object.

These considerations, and others that might be suggested, show that the power conferred upon the common council was wise, and should be sustained, if there be no constitutional objection.

There is a great want of harmony in the decisions of the courts of last resort in the several states upon the power of municipalities to enact ordinances covering the same subject of the criminal laws of the state, and the effect of a prosecution under such ordinances as a bar to a prosecution under the state law. The subject is exhaustively treated and the authorities cited by Mr. Dillon in his work upon Municipal Corporations, in the chapters devoted to " Ordinances " and " Municipal Courts," and also in Horr & Bemis on Municipal Ordinances.

One of the strongest arguments to which my attention has been called against the exercise of this power by a municipality in case of a criminal nature is that the criminal laws of the State ought to be uniform in the elements which go to constitute the crime, the penalty or punishment imposed for the commission of the offense, and in forms and mode of procedure to prosecute the offender; that it is the province of the Legislature to declare what shall constitute crime, and to prescribe punishment therefor; that an offense against the criminal laws of the State is the same offense in whatever locality it is committed, and should subject the offender to the same punishment.

But these considerations are not fundamental. The Legislature has power to declare that certain acts committed in a particular locality shall constitute a criminal offense, and

shall be punished as a felony, while the same act, if done in another locality or section of the State, would not be a criminal offense at all.   Such are the laws which prohibit fishing in certain waters, and many other laws which the Legislature declares shall only be operative in certain designated portions of the State.

There is no provision in our Constitution, as there is in some of the states of the Union, that all laws shall be uniform and equal throughout the State, and consequently the Legislature is not prohibited from legislating for particular localities.

Another argument has been urged with great force.   It is asserted that the clause in the Constitution which authorizes the Legislature to confer upon organized townships, incorporated cities and villages, and upon the board of supervisors, such power of a local, legislative, and administrative character as they may deem proper, only appertains to such local, legislative, and administrative matter as municipalities had been in the habit of exercising from time immemorial; that these include only the ordinary and reasonable by-laws which incorporated cities and villages had been accustomed to enact for the preservation of good order in their local communities, to be enforced by the infliction of penalties and fines in a civil action, without power of imprisonment for breach of such by-laws.

It is claimed that it would be absurd to assert that the Legislature could authorize an organized township to enact criminal laws to be enforced in such township, or for a board of supervisors to do the same thing; that the doctrine, carried to its logical results, would authorize each township in the State, and each county to have its own code of criminal laws, differing from the others;   that neighbors whose farms adjoined, or whose residences were separated by a highway, if residing in different townships, would be subject to different criminal laws; that it would be difficult to imagine the

internecine strifes and bitterness that would be engendered by such a state of affairs.

To declare what shall constitute a crime, and how it shall be punished, is an exercise of the sovereign power of a state, and is inherent in the legislative department of the government. Unless authorized by the Constitution, this power cannot be delegated by the Legislature to any other body or agency. The general criminal laws of the State are in force in every part thereof, and no power but that which enacted can suspend or repeal them. The Constitution has granted to the Legislature authority to delegate to a city or village the right to enact by-laws and ordinances to prevent vice and immorality, and for the enforcement of good order within the limits of the corporation, and for numerous other purposes affecting the health and welfare of its people; and, acting under this authority, the Legislature has conferred power upon the municipalities to enforce the observance of these ordinances by fine or imprisonment, or both.

Common experience, and the necessities of our civilization, have shown that the grant to and exercise by cities and villages of such power to enact ordinances, and to punish for their violation, have been both wise and just, and have not operated oppressively upon the citizen. It is no reason why this power should not be delegated to cities and villages, that, if it should be also delegated to organized townships, it might be abused, and result in internecine strifes and altercations. If it should be attempted, and result in wrong or oppression to the people, the remedy is in their hands. The legislators are chosen by them, and it is in their power to effect any needed reform. Besides, it is quite unlikely that any such event should ever happen, as no necessity exists therefor.

The word "crime" is applicable to both a felony and "misdemeanor." So the words "offense" and "crime" are synonymous, when applied to convictions for violations of

statutes of a public nature. *People v. N. Y. Police Com-missioners*, 39 Hun, 507; *People v. French*, 102 N. Y. 583 (7 N. E. Rep. 913). The words are used interchangeably in our compilations. Whenever a person does an act which is prohibited by law, which act is punishable by fine, penalty, forfeiture, or imprisonment, he commits a crime.

An ordinance, validly enacted, prohibiting certain acts under fines, penalties, or imprisonment, is, within the juris-diction of the municipality enacting it, as much entitled to respectful obedience, and is as much the law of the land for that locality, as a law enacted by the Legislature; and a per-son violating it commits an offense, and in one sense a crime, for which he may be sentenced, if under the authority of a statute the ordinance so provides, to imprisonment at hard labor. To hold that such offenses are not to be classed as crimes would be to take away the power of the Legislature or municipalities from imposing a punishment by imprison-ment at labor, or sentencing to confinement where labor upon inmates is imposed or compelled; for Article 18, § 11, Const. declares that—

" Neither slavery nor involuntary servitude, unless for the punishment of crime, shall ever be tolerated in this State."

Under any other construction of the word " crime," com-mon vagrants, mendicants, vagabonds, montebanks, jugglers, and a large class of offenders against the general laws as well as ordinances duly enacted, would have to be confined in prison without work, and be there supported at the public expense, in idleness.

It rests in the sound discretion of the Legislature to determine to what extent they will give to municipal courts authority to punish offenders. But whatever authority is delegated to municipalities to legislate upon the subject of offenses, and to prescribe within certain limits the punish-ment to be inflicted therefor, it is clear that the constitu-

tional rights of the accused must be protected and preserved in everything that is done, as fully as if the prosecution was for a crime under the general laws of the State. In cases where, on account of the nature of the punishment which may be inflicted, it is classed as *infamous*, every constitutional safeguard must be preserved to the accused. He cannot be denied the right of trial by jury; to be informed of the nature of the accusation; to be confronted with the witnesses against him, etc. In short, the proceedings against him must be by due process of law.

What punishments are considered as infamous are pointed out by Mr. Justice Gray in *Ex parte Wilson*, 114 U. S. 417 (5 Sup. Ct. Rep. 935). He said:

"Imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, 'involuntary servitude for crime,' spoken of  *  *  *  in the thirteenth amendment of the Constitution, by which all other slavery was abolished."

See also *Jones v. Robbins*, 8 Gray, 329, 349; Article 18, § 11, Const. Mich. In the case of *Ex parte Wilson* the Court held that a sentence to hard labor in the Detroit House of Correction for a stated time was an infamous punishment.

Hard labor, in itself, is not infamous or degrading. On the contrary, it is ennobling, and is the foundation upon which reposes all true progress in mental and moral development.

> "An angel's wing would droop if long at rest,
> And God himself, inactive, were no longer blest."

The infamy and degradation consist in its being involuntary. The distinction is the difference between liberty and slavery.

In Hanrahan's case he was arrested and brought before the court upon complaint on oath and warrant charging him with the offense, of the commission of which he pleaded guilty. The charter provided for his trial by jury, if he demanded it. His arrest, conviction under a plea of guilty,

and sentence appear to have been in accordance with due process of law. The ordinance under which he was convicted did not permit punishment by imprisonment to be imposed, but authorized the imposition of a fine, and, in default of payment, with imprisonment until paid, not exceeding six months.

The only question of importance is whether the Legislature, by the amendment of 1887, making the offense a felony and punishable as such, repeals the provisions of the city charter above quoted. There is no repeal in express terms, and repeals by implication are not favored. *Gordon v. People*, 44 Mich. 485 (7 N. W. Rep. 69); *Ryan's Case*, 45 Id. 173 (7 N. W. Rep. 819); *Brown v. McCormick*, 28 Id. 215; *Breitung v. Lindauer*, 37 Id. 233.

Repeal by implication is never permitted if it can be avoided by any reasonable construction of the statutes. If both acts can be given full force without conflicting with each other, or if the latter act is merely affirmative, or cumulative, or auxiliary, and not inconsistent, both must stand, and the former is not repealed. *People v. Bussell*, 59 Mich. 104, 109 (26 N. W. Rep. 306); Dwar. Stat. 674; *Landis v. Landis*, 39 N. J. Law, 274; *Ruckman v. Ransom*, 35 Id. 5‑5, 566; *Bowen v. Lease*, 5 Hill, 221; *Kinney v. Mallory*, 3 Ala. 626; *Planter's Bank v. State*, 6 Smedes & M. 628; *Supervisors v. Campbell*, 42 Ill. 492; *Norwich v. Story*, 25 Conn. 47.

It must be noticed that the acts we are now considering are not both local acts, as was the case in *People v. Bussell*, but one is a local act, and the other a general act, and the rule of law in such case is that a subsequent general law will not by implication, operate as a repeal of a special law on the same subject, although inconsistent with it. *Ottawa v. La Salle Co.* 12 Ill. 339; *Kenaga v. Kerr*, 14 N. E. Rep. 671; *Nichols v. Bertram*, 3 Pick. 342; *Com. v. Worcester*, Id. 462; *Brown v. Lowell*, 8 Metc. 172, 174; *Tracy v. Goodwin*, 5 Allen, 410; *Granby v.*

*Thurston,* 23 Conn. 420, 421; *City of Janesville v. Markoe,* 18 Wis. 350; *In re Evergreens,* 47 N. Y. 216; *In re Park Commissioners,* 50 Id. 493; *People v. Quigg,* 59 Id. 83; *In re Canal Co.,* 69 Id. 209; *McKenna v. Edmundstone,* 91 Id. 231; *State v. Roosa,* 11 Ohio St. 16.

In *People v. Quigg, supra,* Allen, J., said:

"No intent of the legislature to repeal or interfere with special statutes, applicable only to the city of New York, can be implied from general legislative action upon the subject. Repeal of statutes by implication is not favored, and only takes place when two acts are so inconsistent that both cannot stand, and then the later act prevails. Laws, special and local in their application, are not deemed repealed by general legislation, except upon the clearest manifestation of an intent by the legislature to effect such repeal, and ordinarily an express repeal by some intelligible reference to the special act is necessary to accomplish that end."

And in *McKenna v. Edmundstone,* Andrews, J., said:

"It is well settled that a special and local statute, providing for a particular case or class of cases, is not repealed by a subsequent statute, general in its terms, provisions, and application, unless the intent to repeal or alter is manifest, although the terms of the general act are broad enough to include the cases embraced in the special law."

In *Brown v. Lowell,* 8 Metc., at page 174, Chief Justice Shaw, speaking upon the subject, said:

"That a subsequent legislative act repeals all prior acts repugnant to it is a principle which results from the unlimited nature of legislative power. The last expression of the legislative will must be carried into effect as the law of the land; and if, on its true construction, it is directly repugnant to any prior act, it necessarily annuls it, because both cannot exist together. But to have this effect it must appear that the legislative will was so exercised, or, in other words, that it was the intention of the legislature that the subsequent act should so operate, notwithstanding any repugnancy to former acts. It may happen that acts of special legislation may be made in regard to a place, growing out of its peculiar wants, condition, and circumstances; as formerly various acts were passed in relation to the town of Boston. Afterwards a gen-

eral act may be passed having some of the same purposes in view, extending them generally to all the towns of the commonwealth. * * * It would be a question depending upon a careful comparison of the two acts, and the objects intended to be accomplished, whether the general act must be deemed an implied repeal of the special prior act. In general, we should think it would require pretty strong terms in the general act showing that it was intended to supersede the special acts, in order to hold it to be such a repeal."

This language was quoted and applied in *Tracy v. Goodwin*, 5 Allen, 410.

The Legislature has recognized the fact that houses of ill fame are more obnoxious in cities and villages than in the more sparsely populated districts, and consequently for more than thirty years there has not been a city charter granted but it contained express authority for the common council to enact ordinances to suppress them.

In the general law for the incorporation of cities, enacted in 1873 (chapter 11, § 1, subd. 4, p. 296), it is provided that the common council may pass ordinances—

" To prohibit and suppress all disorderly houses and places, houses of ill-fame, assignation houses, gambling houses, and all places where persons resort for gaming, or to play at games of chance, and to punish the keepers thereof."

And this power has been conferred, notwithstanding the statutes all the while contained the general law upon the subject above quoted. Under these circumstances it appears plain to me that the Legislature intended not only to confer upon the city of Detroit the authority to pass the ordinance in question, but that it should be exercised and enforced by the municipal authorities. Had not the Legislature, by the amendment of 1887, increased the penalty, and made the offense a felony, it is not likely that the question would have been raised.

But it must be remembered that the offense of keeping a house of ill fame, resorted to for the purpose of prostitution

or lewdness, was not a new offense created by the amendment of 1887. So far as this provision of the statute is concerned, it remains the same as it originally stood before the amendment. *Gordon v. People*, 44 Mich. 485 (7 N. W. Rep. 69).

The penalty is changed and made more severe, and new offenses are added. But I can perceive no intention in this to abrogate or repeal the special acts conferring upon the city the power to suppress houses of ill fame, resorted to for the purpose of prostitution or lewdness, and to punish the keepers thereof.

Judge Dillon, in his work on Municipal Corporations (volume 1, §§ 87 and 88, 31 ed.), says:

" It is a principal of very extensive operation that *statutes of a general nature do not repeal,* by implication, *charters and sp cial acts* passed for the benefit of particular municipalities; but they do so when this appears to have been the purpose of the legislature. If both the general and the special acts can stand, they will be construed accordingly. If one *must* give way, it will depend upon the supposed intention of the law-maker, to be collected from the entire legislation, whether the charter is superseded by the general statute, or whether the special charter provisions apply to the municipality, in exclusion of the general enactments. * * * The presumption is not lightly to be indulged that the legislature has by *implication repealed,* as respects a particular municipality, or as respects all municipalities, *laws of a general nature,* elsewhere in force throughout the state; yet a ch rter or special act passed subsequent to the general law, and plainly irreconcilable with it, will to the extent of the conflict operate a repeal of the latter by implication."

The learned author also discusses in sections 366, 367, and 368 of the same volume the validity of ordinances relating to public offenses. He states that the cases, many of which are cited, cannot be reconciled; and in view of this fact he lays down, with some distrust of their entire correctness, these rules:

1. A general grant of power, such as authority to make by-laws for the good government of the place, and the like, should not be held to confer authority upon the corporation to make an ordinance punishing an act which is made punishable as a criminal offense by the laws of the state.

2. Where the act is in its nature one which constitutes two offenses,—one against the state and one against the municipal government,—the latter may be constitutionally authorized to punish it, though it be also an offense under the state law.

3. When the act or matter covered by the charter or ordinance and by the state law is not essentially criminal in its nature, and is one which is generally confided to the supervision and control of the local government of cities and towns, but is also of a nature to require general legislation, the intention that the municipal government should have power to make new, further, and more definite regulations, and enforce them by appropriate penalties, will be inferred from language which would not be sufficient were the matter one not specially relating to corporate duties, and fully provided for by the general laws.

Most of the decided cases will range themselves under the three general rules above laid down. But these rules do not cover a case where the legislature, having a constitutional authority to delegate legislative power to a municipality, has conferred *express authority upon it to legislate upon a particular act* declared by the general law to be a crime, and punishable as a criminal offense under the general law. In such case, where the local body exercises the power conferred by passing an ordinance, it becomes the law of the territory over which the local body has jurisdiction. It has the same force and effect as law as a like act of the legislature would have if passed in the very terms of the ordinances.

Take the case under consideration as an illustration. Suppose in 1884 the Legislature had passed a special act for the city of Detroit in the very words of the ordinance; then we should have had a general law of the State, and also a special law applicable to and in force only in the city of Detroit, both covering the same object, namely, suppressing houses of ill fame, defining the offense in the same language, and prescribing different punishments therefor. Applying the familiar rules of construction, the special law would operate as a repeal by implication of the general law in the city of Detroit. *McGavisk v. State, M. & E. R. R. Co.,* 34 N. J. Law, 509; *State v. Clarke,* 54 Mo. 17.

Suppose later, and in 1887, the general law was amended so as to increase the severity of the penalty, and make the offense a felony; would it be entirely clear that the amendment was intended to operate as a repeal of the special act?

In all questions relative to repeals by implication the intention of the Legislature is the prime object of inquiry. And such intention must be gathered from the language and purposes of the respective enactments, as well as all laws bearing upon the subject.

There is nothing in the amendment indicating that the law should have a more extended territorial operation than before. There is nothing in the current history of events which indicates that there was a necessity for a more stringent enactment to prevent and punish this crime in the city of Detroit; on the contrary, we cannot well ignore the notorious fact that the necessity for a more severe penalty arose from the atrocious acts of parties who kept such houses in the vicinity of lumbering camps and mining towns, at places very remote from the city of Detroit, and whose nefarious schemes in enticing females into their dens of iniquity shocked the sensibilities of the whole people of the S.ate, and resulted in the amendment of the law, declaring it a felony, and ordering the act to take immediate effect. Where no repealing words are inserted in a later act, a strong presumption arises that no repeal was intended, or it would have been expressed. *M'Neely v. Woodruff*, 13 N. J. Law, 356.

My conclusions, based upon what I consider reason, and the decided weight of authority, are these:

The local act may be exclusive of the general law, and operate to repeal it by implication; as where its provisions are repugnant to or inconsistent with the general law.

Both laws may be concurrent; as where there is no repugnance, or where one is merely auxiliary or cumulative to the other.

In the former case there can be no prosecution except under the local law.

In the latter case prosecutions may be instituted under either law, and the court that first acquires jurisdiction over the person of the accused has exclusive jurisdiction to hear, try, and determine the case; and a conviction for an offense which is the same in both laws will be a bar to a prosecution for the same offense under the other law.

I think the ordinance in question is valid, and that the charter provisions authorizing its enactment were not repealed by implication, but are in force, and valid. It follows that the conviction must be affirmed.

SHERWOOD, C. J., MORSE and LONG, JJ., concurred.